## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jul 09 2020, 9:49 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Jennifer A. Joas
Madison, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of Parental Rights of:

R.G., III *(Minor Child)*

and

S.G. *(Mother)* & R.G. *(Father)*,

*Appellants-Respondents,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner,*

July 9, 2020

Court of Appeals Case No. 19A-JT-3014

Appeal from the Dearborn Circuit Court

The Honorable James D. Humphrey, Judge

Trial Court Cause No. 15C01-1905-JT-12

**Robb, Judge.**

# Case Summary and Issues

S.G. ("Mother") and R.G. ("Father") (collectively "Parents") separately appeal the juvenile court's judgment terminating their parental rights to their minor child, R.G. ("Child"). This case presents two issues for our review: (1) whether Indiana Department of Child Services ("DCS") deprived Mother of due process by failing to make reasonable efforts to reunify through visitation before filing its petition to terminate her parental rights; and (2) whether the juvenile court's judgment terminating Father's parental rights was clearly erroneous. Concluding DCS did not deprive Mother of due process and the juvenile court's judgment was not clearly erroneous, we affirm.

# Facts and Procedural History

Mother and Father were married in 2011 and are the biological parents of Child, born April 4, 2014. On June 19, 2017, DCS received a report alleging that Child was being locked in a room and neglected; the report also alleged various safety issues in the home and unsanitary living conditions. The same day, DCS family case manager ("FCM") Tristan Thomas and law enforcement officers visited Parents' home, which was a single wide mobile home.

At the time DCS arrived, Mother was home with Child; Father and Child's maternal aunt had left about two hours earlier to get groceries. As soon as Thomas walked inside the home, he observed Child in the hallway confined behind two baby gates stacked on top of each other from the floor almost to the

ceiling. Child was naked and had feces "caked on his arms, hands, feet, and . . . face." Transcript of Evidence, Volume II at 20. Behind the gate, Thomas saw feces on the floor and dirty diapers. And outside the gate, there was a potty-training toilet filled with urine. Thomas went through the gate to Child's bedroom where he saw "more feces scattered on the floor, . . . dark spots in the carpet, [and] a torn and tattered mattress . . . [which] was [a] very yellow tint in color with feces smeared on top[.]" *Id.* at 22. There were also fifteen to twenty applesauce packets all over the floor of Child's room and feces smeared all over the window, walls, and a teddy bear. There were exposed electrical outlets. The room smelled of urine and some of the feces "had white mold growing on top of it," possibly indicating it had been there for a while. *Id.* at 26. Thomas described Child as non-verbal and that Child used "his own language [of] grunts and moans" to communicate. *Id.* at 35.

[4] Thomas spoke with Mother and "perceived that she was of a lower-functioning capacity." *Id.* at 30. Mother indicated she put the gate on top of the other gate because Child would climb over one gate and get out. At some point, Father and maternal aunt returned. Father told Thomas that Mother had mental health issues and he worked a lot, which required that he leave Child with Mother. When asked about the condition of the home, Father explained that the smell was recent and due to their failure to clean over the last few days. Father stated that the home is cleaned often, and Child is bathed daily.

[5] Child was removed from the home immediately. Before taking Child to his foster placement, Thomas used twenty to thirty baby wipes to clean the dirt and

crusted feces from Child. Despite his efforts, "it still wasn't coming off." *Id.* at 33. At the time, Child's hair was extremely long and matted. After Child was placed with his foster mother, she washed Child's hair three times before contacting Thomas for permission to get Child's hair cut because his hair could not be cleaned and continued to smell of urine.

[6] On June 20, DCS filed a petition alleging Child was a child in need of services ("CHINS"). The next day, the juvenile court held an initial/detention hearing during which the juvenile court entered denials on behalf of Parents. Following Child's removal, Parents had two or three supervised visits with Child. However, on July 13, the State charged Parents each with two counts of neglect of a dependent, as Level 5 and Level 6 felonies, and one count of criminal confinement, a Level 6 felony, and Parents were arrested. *See* Exhibits, Volume I at 90. As a result, no contact orders were issued against Parents and DCS ceased all visitation.

[7] Mother spent seventy-two days in the Indiana Department of Correction ("DOC") before she was released. Ultimately, in 2018, Father and Mother entered into separate plea agreements pursuant to which they each pleaded guilty to one count of Level 5 felony neglect of dependent, and the remaining charges were dismissed. Father was sentenced to six years, two years in community corrections and four years suspended to probation. *See id.* at 106. Mother was sentenced to six years, with credit for the seventy-two days spent in the DOC, 658 days in community corrections, and four years suspended to probation. *See id.* at 122. The no contact orders were to remain in effect for the

duration of Parents' executed sentences and/or probation from the date of their sentencing: February 20, 2018 for Mother and August 1, 2018 for Father.

[8] A fact-finding hearing was held on August 21, 2017, at the conclusion of which the juvenile court adjudicated Child a CHINS. Following a dispositional hearing, the juvenile court entered a dispositional decree ordering Parents to (among other things): maintain contact with the FCM; notify the FCM of any arrest or criminal charges; maintain stable, safe, and sanitary housing; timely enroll and participate in any recommended programs; complete a parenting assessment and all recommendations; attend scheduled visitation; and comply with the no contact order. *See id.* at 30-34. Mother was also ordered to complete a psychological evaluation, successfully complete all recommended treatment, and comply with mental health treatment.

[9] DCS FCM Karen Lindsey began working with Parents on July 18, 2017. When Lindsey was assigned the case, she put in referrals for home-based casework, individual counseling, parenting classes, psychological evaluations, and visitation for Parents, as well as Fatherhood Engagement for Father. Ultimately, Lindsey worked with Parents for over two years.

[10] Parents participated in home-based casework with Karen Duquette of Ireland Home Based Services. Duquette and Parents met weekly for just over two years – from June 2017 to July 2019 – during which time they focused on parenting education, household cleaning, and obtaining benefits. Mother also began individual counseling with Melissa Hughes, a therapist at Bridges

Counseling. Mother attended counseling sessions weekly for fifteen months to work through trauma, develop coping skills and a healthy support network, and identify boundaries and feelings. Father enrolled in and completed the Nurturing Fathers program, a thirteen-week program that aids fathers in developing and understanding their emotions, parenting, co-parenting, and doing what is best for their child. Parents also completed the Nurturing Parenting program, a twelve to thirteen-week parenting program.

[11] Following review hearings on December 20, 2017 and March 14, 2018, the juvenile court issued orders finding that Parents had been compliant with the case plan, participated in services, and enhanced their ability to fulfill their parental obligations. *See id.* at 38-39, 44. However, the juvenile court found that the cause of Child's out-of-home placement had not been alleviated and Parents had not completed the goals in the dispositional decree. *See id.* at 39, 44. On May 31, 2018, the juvenile court issued an order approving a permanency plan of reunification but finding that due to Parents' on-going criminal case and the no contact order, DCS had not been able to offer visitation between Child and Parents. *See id.* at 48-49.

[12] In June 2018, Mother and Father each underwent a full psychological evaluation conducted by Linda McIntire, a licensed clinical psychologist. Dr. McIntire reported that Mother suffers from "significant cognitive impairment" and ultimately diagnosed her with a mild intellectual disability. *Id.* at 138. In her report, Dr. McIntire concluded that "the totality of this evaluation substantiates that [Mother] cannot, and should not, be responsible for [Child]

alone; she virtually does not have the ability to safely do so, even with continued parenting education." *Id.* at 139. As such, she recommended medication management, case management to develop independent living skills, and developmental services. Based on Mother's evaluation, she concluded that Father "needs to be willing and able to function logistically as though he is a single parent[; he] will need to . . . embrace and master this role of primary responsible parent if reunification is to occur." *Id.* at 140.

[13] With respect to Father, Dr. McIntire reported that he does not have mental health disorder but testing "reveal[ed] some arrogant attitudes consistent with a mild narcissistic presentation[.]" *Id.* at 150. Specifically, she found that:

> [Father] minimized the severity and duration of the problem . . . .
> He claimed that [C]hild was clean when he left shortly before
> DCS arrived and omitted any acknowledgement of the fecal
> smearing throughout the bedding, walls, and carpet. He
> described the house as less clean than usual . . . with no
> recognition that two adults should be fully able to pick up a
> house and clean up human waste, even with a toddler. . . .
>
> While he may not have had the experience to grasp the severity
> of [C]hild's developmental delays, [Father] has the intellectual
> ability to understand that double-gating a child, living in human
> excrement, and failing to maintain a minimally clean house are
> negligent and/or dangerous; and, he has the capacity to
> anticipate that if his wife cannot self-care, she most certainly
> cannot care for a fast-moving child who has the capacity to injure
> himself but not understand inherent dangers. While finding
> informal supports would be helpful, success in this case rests on
> [Father] assuming full responsibility for the home and [C]hild,

rather than abdicating care of a vulnerable child to a woman he describes as disabled and married in order to care for and protect.

*Id.* Accordingly, Dr. McIntire recommended that Father continue ongoing parenting education.

[14] The juvenile court again found Parents to be cooperative and compliant with services on August 23, 2018. At the time, the no contact orders remained in effect. At some point, DCS requested that Stacey Cornett, a child therapist with Community Mental Health Center, complete a parenting assessment to determine whether Child would be harmed if visits were to occur. On November 21, a periodic case review was held during which Cornett testified she could not adequately complete a parenting assessment without first completing an Attaching and Bonding Assessment between Parents and Child. Therefore, the juvenile court authorized contact between Parents and Child for the sole purpose of completing the assessment. The no contact orders in Mother and Father's respective criminal cases were modified to allow therapeutic visits with Child through Cornett.

[15] Cornett completed separate parenting assessments. Cornett believed Mother had a "very shallow understanding" of and was "very dismissive of the idea" that Child suffered trauma, which Cornett identified as a "huge red flag" and very concerning. Tr., Vol. II at 146. In Father's parenting assessment, he displayed a "strong denial that anything that had happened to [Child] as being traumatic . . . a very narcissistic type of presentation, which everything kind of circled back to him." *Id.* at 147. Following the individual assessments, Cornett

supervised individual therapeutic visits between Child and each parent. Mother needed to be coached during her visit and acted more like a playmate than a caregiver. Cornett described Father's nurturing capacity as weak and noted that Child took the lead in playing with Father. At one point, Cornett asked Father how he would handle a particular situation and he responded, "How am I supposed to know? I'm not a therapist." Appealed Order at 5; *see* Tr., Vol. II at 201.

[16] Following the individual visits, Cornett then supervised a joint visit with Parents and Child. Unfortunately, the visit was not successful. Child, rather than Parents, led the session and at one point, Father began poking Child to get him to laugh; however, Cornett described Child as being "notably agitated" and uncomfortable during the interaction. Tr., Vol. II at 163. Cornett instructed Father to stop poking Child, but Father ignored her. When he finally stopped, Child "walked across the room, got in a chair, tried to cover up his face, and curled into a ball" indicating that Child was "over his capacity [and] disassociating." *Id.* at 164. Cornett stopped the visit immediately. Ultimately, these symptoms, in part, resulted in Child's disinhibited social engagement disorder diagnosis. *See id.* at 165. After the unsuccessful joint visit, Cornett determined that no more visits should occur because "the level of disassociation [she witnessed] when a child gets to that point, they're reliving, typically a traumatic event that is very disconcerting to them and they're not in a state where they're able to manage it, so that's a protective mechanism to keep them from experiencing the stress of that situation." *Id.* at 167. Cornett consulted

two other child psychiatrists and both concluded visits would cause undue harm to Child and no more visits should occur.

[17] As part of her criminal case, Mother was on house arrest until January 2019. Following a hearing on February 25, 2019, the juvenile court issued an order finding that Parents had been compliant with services; however, the "application of that information continues to be a struggle" and Parents "have not been able to demonstrate that they are capable of caring for [C]hild." Exhibits, Vol. I at 66-67. The juvenile court changed Child's permanency plan from reunification to adoption.

[18] DCS filed its verified petition to terminate Mother and Father's parental rights to Child on May 3, 2019. Since DCS intervention, Parents had cleaned the home and been able to maintain the cleanliness and organization, and, at some point in 2019, Father made significant improvements on the home, including new flooring.

[19] A fact-finding hearing was held over the course of five days between June and October. Following the hearing, the juvenile court issued an order terminating Parents' parental rights. In addition to making findings about the facts previously stated, the juvenile court made the following additional findings relating to a reasonable probability that the continuation of the parent-child relationship poses a threat to Child's well-being:

> f) . . . The evidence [of the condition of] the home is consistent with long term neglect which led to the horrendous

living conditions of [C]hild. The home conditions and the state of [C]hild occurred over a long period of time.

* * *

h)      . . . [Child's foster mother] stated that [C]hild had no language skills and had his own language of grunts and basic words to express himself. [C]hild also had boundary issues, which concerned [her]. . . . [Child's foster mother] took [C]hild to speech therapy throughout October and November 2017. [C]hild is now attending individual therapy. He is still delayed on vocabulary and social skills, but he has greatly improved since being placed with her.

i)      [C]hild's preschool teacher, . . . had initial concerns about [Child's] vocabulary and social skills [as well as] his food habits, because he would become emotional if his food was accidentally thrown away. This caused her to believe that he may not have been fed enough when he was with [P]arents. . . .

* * *

p)      . . . While [P]arents consistently attended and participated in [home-based casework], lack of motivation . . . [was a] persistent issue[ ]. Mother also had problems with independent living skills and multi-tasking, which is consistent with [her] psychological evaluation. . . . [P]arents were partially successful with completion of [home-based casework] services [but] it took weekly visits and weekly reminders for relatively simple tasks for be completed.

* * *

u)      . . . On two (2) separate occasions following the last visit, [C]hild told Ms. Cornet and FCM Lindsey that he didn't want to see [P]arents again and that he didn't like them.

v)      [C]hild experienced the following deficits while living with [P]arents: no social interaction, a low vocabulary, and virtually no stimulation. [C]hild may never recover from these deficits, and [P]arents, with their own deficits, will not be able to help [C]hild overcome his deficits. . . . [P]arents are incapable of dealing with the significant, present and future needs of [C]hild – conditions and needs which they created.

* * *

x)      Mother . . . argued that the feces that was smeared on [Child's] bedroom window and on himself was not feces; it was a snack cake she had given him before [DCS] arrived at the home. She also stated that his hair was matted because he ate the snack cake and then ran his hands through his hair. Mother admits that [C]hild was behind the baby gates when [DCS] arrived, but that she was cleaning the rest of the house, and she only puts him in that area when she's cleaning. . . .

* * *

Termination is in the child's best interests . . . in that:

a)      Mother cannot, and should not, be the sole and primary caregiver for [C]hild. She cannot safely do so, even with the amount of parenting education that she has been offered or [with] continued parenting education. Mother's developmental delay makes her unable to participate in abstract thinking – a necessity when parenting a child. No amount of help from service

providers or therapists can help her achieve a level of understanding to care for [C]hild.

b)     Father continues to portray himself as a victim and continues to minimize the amount of trauma that [C]hild has experienced. Father had approximately six (6) months of parenting education and was still unable to answer a simple question . . . about how he would handle a particular situation. In addition, he dismissed Ms. Cornett during his joint visit session with [Mother] and [Child] and failed to follow her instructions, which led to [Child] shutting down and experiencing more trauma.

c)     [P]arents have caused [Child] trauma and developmental deficits, from which he may never recover. [Child] was treated as a caged animal as a result of [their] cruel confinement and neglect. [Child] became almost a feral child.

* * *

[P]arents' minimization of the state of [C]hild when he was removed continues to be a concern. An additional concern is that the only plan that [P]arents have for the care of [C]hild is that [M]other would care for him with other institutional help. Father seems unwilling to accept the responsibility of being a single parent, and his "plan" is for [C]hild to go to school, then daycare, until [F]ather picked him up. In fact, [P]arents have shown that they are incapable of caring for [C]hild and his significant needs – special needs which they created. [Father] does not have a plan if [C]hild was sick or did not have school, which would leave that responsibility with [M]other, who is incapable of caring for [C]hild. [DCS] has a satisfactory plan for the care and treatment of [C]hild, which is: adoption.

Appealed Order at 2-9.  The juvenile court concluded that there is a reasonable probability that the continuation of the parent-child relationship poses a threat to Child's well-being and that termination of Parents' parental rights is in Child's best interests.  Mother and Father now appeal separately.[1]

# Discussion and Decision

## I. Mother's Appeal:  Due Process

[20] Mother's only claim on appeal is that DCS deprived her of due process by failing to make reasonable efforts to reunify her with Child, namely denying her visitation with Child.  As a threshold issue, we first address the State's argument that Mother has waived appellate review of any due process claim because she did not specifically raise the issue to the juvenile court during the CHINS or termination proceedings.  *See* Consolidated Brief of Appellee at 34.

[21] A parent's failure to raise a due process claim to the trial court in a CHINS or termination proceeding results in waiver.  *S.L. v. Ind. Dep't of Child Servs.,* 997 N.E.2d 1114, 1120 (Ind. Ct. App. 2013).  And although Mother argued in her opening and closing arguments at trial that DCS failed to make reasonable efforts to reunify the family, she concedes she did not specifically raise a due process issue to the juvenile court.  *See* Appellants' Brief of Mother at 15.

---

[1] On February 3, 2020, this court granted DCS' motion to consolidate the Parents' appeals and allowed DCS to file a consolidated brief.

Nonetheless, this court has discretion to address such claims, especially when they involve constitutional rights, the violation of which would be fundamental error. *Matter of D.H.,* 119 N.E.3d 578, 586 (Ind. Ct. App. 2019), *aff'd on reh'g, trans. denied; see also L.B. & S.B. v. Morgan Cty. Dep't of Pub. Welfare,* 616 N.E.2d 406, 407 (Ind. Ct. App. 1993) ("The constitutionally protected right of parents to establish a home and raise their children . . . mandates that the failure of a trial court to require compliance with any condition precedent to the termination of this right constitutes fundamental error which this court must address sua sponte."), *trans. denied.* Because Mother's substantive due process right to raise her child is at issue, we exercise our discretion to review her due process claim even though it was not raised to the juvenile court.

[22] The crux of Mother's argument is that DCS failed to "provide meaningful visitation to [her] thereby failing to make reasonable efforts to reunify [her] with Child[.]" Br. of Mother at 14. Mother contends the alleged due process violation warrants reversal of the juvenile court's order terminating her parental rights.[2] We disagree and conclude DCS made reasonable efforts to reunify the family and did not deprive Mother of due process.[3]

---

[2] In her brief, Mother acknowledges she "does not challenge either the [juvenile court's] findings or specific conclusions[.]" *Id.* at 13.

[3] Father does not explicitly raise a due process argument with respect to visitation; however, he does argue that he complied with every aspect of the dispositional decree *except* visitation because the no contact order prevented him from doing so. *See* Appellant's Brief [of Father] at 16. To the extent Father's argument can be interpreted or construed as a due process argument, the same analysis discussed below is applicable to Father.

[23] The Fourteenth Amendment to the United States Constitution states that no person shall be deprived of "life, liberty, or property without due process of law." U.S. Const. amend XIV. The fundamental right to raise one's child is "more basic, essential, and precious than property rights" and is protected by the Due Process Clause. *Hite v. Vanderburgh Cty. Office of Family & Children*, 845 N.E.2d 175, 181 (Ind. Ct. App. 2006). Accordingly, when the State seeks to terminate a parent-child relationship, it must do so in a manner that meets the requirements of the Due Process Clause. *In re H.L.*, 915 N.E.2d 145, 147 (Ind. Ct. App. 2009). Due process in the context of parental rights requires balancing three factors specified in *Mathews v. Eldridge*, 424 U.S. 319 (1976): (1) the private interests affected by the proceeding; (2) the risk of error created by the State's chosen procedure; and (3) the countervailing governmental interest supporting use of the challenged procedure. *Id.* at 335; *Matter of D.H.,* 119 N.E.3d at 588. The private interest affected by the proceeding is substantial, namely a parent's interest in the care, custody, and control of his or her child. *S.L.*, 997 N.E.2d at 1120. But the State's interest in protecting a child's welfare is also substantial. *Id.* Therefore, we focus on the risk of error created by DCS' and the juvenile court's actions. *Id.*

[24] During CHINS proceedings, "DCS is generally required to make reasonable efforts to preserve and reunify families[.]" *In re H.L.*, 915 N.E.2d at 148 (citing Ind. Code § 31-34-21-5.5). And "[i]n determining the extent to which reasonable efforts to reunify or preserve a family are appropriate[,] the child's health and safety are of paramount concern." Ind. Code § 31-34-21-5.5(a).

However, this CHINS provision is *not* a requisite element of our termination of parental rights statute, and even a complete failure to provide services would not serve to negate a necessary element of the termination statute and require reversal. *In re E.E.,* 736 N.E.2d 791, 796 (Ind. Ct. App. 2000). Here, Mother and Father could not participate in visitation due to no contact orders attributable to their respective neglect of a dependent convictions, which were entered to protect Child's health and safety. DCS referred Mother and Father to numerous services, including home-based casework, individual counseling, parenting education and classes, and psychological evaluations – all aimed at enhancing Mother and Father's ability to care for Child with the goal of reunifying the family. In fact, testimony at the fact-finding hearing revealed that DCS offered Parents every pertinent service they could think of. *See* Tr., Vol. II at 207 (DCS FCM testifying that, with respect to services, she "literally gave [Parents] every single [referral] that [she] could possibly think of").

[25] In sum, the no contact order is attributable to Mother's own criminal charges and was entered to protect Child and therefore, DCS could not offer visitation. Contrary to Mother's argument, the record reveals that not only did DCS make reasonable efforts to preserve and reunify the family, it made every reasonable effort possible, and did not deprive Mother of due process. Even if DCS failed to provide any services, it is not an element of our termination of parental rights statute and cannot serve as a basis for reversal of termination of parental rights order. There was no due process violation.

# II. Father's Appeal: Termination of Parental Rights

Father contends the juvenile court's order terminating his parental rights is clearly erroneous.

## A. Standard of Review

We reiterate that the right of parents to establish a home and raise their children is protected by the Fourteenth Amendment to the United States Constitution. *In re D.D.,* 804 N.E.2d 258, 264 (Ind. Ct. App. 2004), *trans. denied.* The law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. *In re R.H.*, 892 N.E.2d 144, 149 (Ind. Ct. App. 2008). Although we acknowledge that the parent-child relationship is "one of the most valued relationships in our culture[,]" we also recognize that "parental interests are not absolute and must be subordinated to the child's interests in determining the proper disposition of a petition to terminate parental rights." *Bester v. Lake Cty. Office of Family & Children,* 839 N.E.2d 143, 147 (Ind. 2005) (internal quotations omitted). The involuntary termination of one's parental rights is the most extreme sanction a court can impose because termination severs all rights of a parent to his or her children. *See In re T.F.*, 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), *trans. denied*. As such, termination is intended as a last resort, available only when all other reasonable efforts have failed. *Id*. The purpose of terminating parental rights is to protect children, not to punish parents. *In re D.D.*, 804 N.E.2d at 265.

[28] When reviewing the termination of parental rights, we do not reweigh the evidence or judge the credibility of witnesses. *Lang v. Starke Cty. Office of Family & Children*, 861 N.E.2d 366, 371 (Ind. Ct. App. 2007), *trans. denied*. Instead, we consider only the evidence most favorable to the judgment and the reasonable inferences that can be drawn therefrom. *Id.* In deference to the trial court's unique position to assess the evidence, we will set aside its judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*; *cert. denied*, 534 U.S. 1161 (2002). Thus, if the evidence and inferences support the decision, we must affirm. *Id.*

[29] The juvenile court entered findings of fact and conclusions thereon as required by Indiana Code section 31-35-2-8(c), and we therefore apply a two-tiered standard of review, *Bester*, 839 N.E.2d at 147. We first determine whether the evidence supports the findings, then determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). A judgment is clearly erroneous only if the findings do not support the court's conclusions or the conclusions do not support the judgment. *Id.*

## B. Statutory Framework for Termination

[30] To terminate parental rights, Indiana Code section 31-35-2-4(b)(2) requires DCS to prove, in relevant part:

(B) that one (1) of the following is true:

>  (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

>  (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

>  (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

DCS must prove the foregoing elements by clear and convincing evidence. Ind. Code § 31-37-14-2; *In re V.A.*, 51 N.E.3d 1140, 1144 (Ind. 2016). However, because subsection (b)(2)(B) is written in the disjunctive DCS need only prove one of those three elements by clear and convincing evidence. *See, e.g., In re I.A.*, 903 N.E.2d 146, 153 (Ind. Ct. App. 2009). If a juvenile court determines the allegations of the petition are true, then the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

# C. Threat to Child's Well-being

[31] First, we note that Father does not challenge any of the juvenile court's findings; therefore, we accept the findings as true. *McMaster v. McMaster,* 681 N.E.2d 744, 747 (Ind. Ct. App. 1997). Instead, Father challenges the juvenile court's conclusion that there is a reasonable probability that the parent-child relationship poses a threat to the well-being of Child. In essence, Father contends this conclusion is erroneous because the undisputed record reveals he was "one hundred percent [compliant] with every aspect of the reunification plan" and "did everything he could to receive the information [the service providers] provided and change his behaviors and way of thinking." [Father's] Br. at 19. He argues that at the time of the fact-finding hearing, he had "completed every task he was set to and made every effort available." *Id.*[4] We conclude the juvenile court's findings support its conclusion that the parent-child relationship with Father poses a threat to Child's well-being.

[32] In determining whether the continuation of a parent-child relationship poses a threat to a child, the juvenile court should consider a parent's habitual pattern of conduct to determine whether there is a substantial probability of future neglect or deprivation. *In re A.P.,* 981 N.E.2d 75, 81 (Ind. Ct. App. 2012). The

---

[4] As noted above, *supra* ¶ 22 n.3, Father does not explicitly raise a due process argument or allege DCS failed to make reasonable efforts to reunify the family in his appellate brief. However, the heart of Father's argument that termination of his parental rights was erroneous is that he was fully compliant with every requirement of the dispositional decree except for visitation due to the no contact order. *See* [Father's] Br. at 16. Because Father argued to the juvenile court that DCS did fail to make reasonable reunification effort, we reiterate that – to the extent that the substance of Father's argument can be construed as the same argument he made at trial – our reasonable efforts/due process analysis above applies. *See supra* ¶¶ 24-25.

juvenile court should also judge a parent's fitness to care for a child as of the time of termination proceedings, taking into consideration evidence of changed conditions. *Id.* When the evidence shows that the child's emotional and physical development is threatened, termination of the parent-child relationship is appropriate. *In re L.S.*, 717 N.E.2d at 210-11. Unfortunately, such is the case here.

[33]   Here, the juvenile court concluded, "[P]arents caused [Child] trauma and developmental deficits, from which he may never recover. [Child] was treated as a caged animal as a result of [P]arent's cruel confinement and neglect. [Child] became almost a feral child." Appealed Order at 8. While in Parents' care, Child had no social interaction or stimulation and, as a result, now suffers from various social and developmental deficits. When DCS initially intervened, Child was found confined behind gates, naked, covered in feces, and surrounded by extremely unsanitary living conditions. Child was severely developmentally delayed, had attachment and boundary issues, and no language skills. Cornett explained that children can have "such a lack of human interaction that they have developmental losses in so many areas or [do not] achieve developmental milestones." Tr., Vol. II at 179. Child's foster mother testified that when Child was placed with her, he was three years old but "he was more [of a] one-year-old, as far as what he was able to express and . . . understand. His abilities, his understanding of the world was really several years behind where he should have been[.]" *Id.* at 122. Similarly, Child's preschool teacher stated that Child was "very far behind size-wise – behind [in]

development in every way, language-wise, cognitively" and that he did not have social or emotional regulation skills. *Id.* at 135. At the fact-finding hearing, she testified she has been Child's preschool teacher for two year and Child is "still a bit below. He's going to require continued support, and just continued high parenting skills and support[.]" *Id.* at 139.

[34] There is no doubt that Father was compliant with services. However, the evidence demonstrates that despite all of these services, including six months of parenting education, he has consistently struggled to apply what he has learned, rendering him incapable of caring for Child and the significant needs he created for Child – thus posing a risk of future neglect and additional developmental delays. This inability is illustrated in the therapeutic visit during which Cornett asked Father how he would handle a particular parenting situation and Father responded with "How am I supposed to know? I'm not a therapist." Appealed Order at 5. The juvenile court found, based on Cornett's testimony, "there were more concerning interactions, including a complete lack of nurturing behavior and an inability to follow simple directions." *Id.* Ultimately, Cornett did not believe Parents, given their own deficits, would be able to care for Child, who now has significant needs. *See* Tr., Vol. II at 180.

[35] In sum, the evidence in the record and the juvenile court's findings sufficiently support the conclusion that the continuation of the parent-child relationship poses a threat to Child's well-being.

# D. Best Interests

[36] Father also takes issue with the juvenile court's conclusion that termination of parental rights is in Child's best interests.

[37] To determine the best interests of children, the juvenile court looks to the totality of the evidence and must subordinate the interests of the parents to those of the children. *In re D.D.*, 804 N.E.2d at 267. "A child's need for permanency is an important consideration in determining the best interests of a child[.]" *In re D.L.*, 814 N.E.2d 1022, 1030 (Ind. Ct. App. 2004), *trans. denied*. The juvenile court need not wait until a child is irreversibly harmed before terminating parental rights. *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003).

[38] "A parent's historical inability to provide a suitable environment along with the parent's current inability to do the same supports a finding that termination of parental rights is in the best interests of the child[ ]." *Lang*, 861 N.E.2d at 373. And a child should not be compelled to suffer emotional injury, psychological adjustments, and instability to preserve parental rights. *In re L.S.*, 717 N.E.2d at 210.

[39] Here, the juvenile court found that termination of Father's parental rights would be in Child's best interests because Father consistently minimizes Child's trauma, portrays himself as a victim, and fails to take responsibility for his role in creating this trauma and resulting deficits. In addition, the juvenile court found:

the only plan that [P]arents have for the care of [C]hild is that [M]other would care for him with other institutional help. Father seems unwilling to accept the responsibility of being a single parent, and his "plan" is for [C]hild to go to school, then daycare, until [F]ather picked him up. In fact, [P]arents have shown that they are incapable of caring for [C]hild and his significant needs – special needs which they created. [Father] does not have a plan if [C]hild was sick or did not have school, which would leave that responsibility with [M]other, who is incapable of caring for [C]hild.

Appealed Order at 8-9.

[40] Father subjected Child to long term neglect and cruel confinement such that Child was significantly harmed and continues to have social and developmental deficits. Despite significant parenting education, Father is still incapable of caring for Child – particularly a child with exceptional needs – and it is undisputed that Child has made significant improvements since his removal from Parents. The testimony of service providers may support a finding that termination is in a child's best interests. *In re S.K.,* 124 N.E.3d 1225, 1234 (Ind. Ct. App. 2019), *trans. denied.* And here, Cornett and FCM Lindsey both testified at the fact-finding hearing that termination of the parent-child relationship is in Child's best interests. *See* Tr., Vol. II at 174, 207. Given this evidence, the juvenile court's conclusion that termination is in Child's best interest is supported by the evidence and the findings.

# Conclusion

[41] We conclude Mother has not shown she was deprived of due process and the juvenile court's findings support its judgment terminating Parents' parental rights. Therefore, the termination order is not clearly erroneous. Accordingly, we affirm.

[42] Affirmed.

May, J., and Vaidik, J., concur.